## NATIONAL ASSOCIATION OF HOME BUILDERS, Appellant,

### v.

### Gale A. NORTON, Secretary of Interior, et al., Appellees.

### No. 01–5283.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 4, 2002.

Decided Nov. 5, 2002.

Rafe Petersen argued the cause for appellant. With him on the briefs was Lawrence R. Liebesman. Duane J. Desiderio entered an appearance.

David J. Ball, Jr., Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were Roscoe C. Howard, Jr., U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Before: EDWARDS, ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

The principal issue in this appeal is whether Exemption 6 of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(6) (2000), applies to site-specific information about the location of an endangered species where disclosure might identify individuals' private property. The National Association of Home Builders ("NAHB") appeals the grant of summary judgment to the Secretary of the Interior on NAHB's request for release of information on the location of nesting sites of the cactus ferruginous pygmy owl in Arizona. The Secretary provided NAHB with numerous documents on the location of the owl, but, invoking several FOIA exemptions, the Secretary redacted the documents to conceal most of the site-specific location that NAHB sought. Assuming that the requested files are "similar files" under Exemption 6, we hold, upon *de novo* review, that the public interest in disclosure outweighs the privacy interests reflected in the Secretary's evidence. Accordingly, because Exemptions 3, 4, and 5 do not bar release of the requested documents, we reverse the grant of summary judgment and remand the case with instructions to order the Secretary to release the site-specific information without revealing individual property owners' names, which NAHB no longer requests.

## I.

In 1997 the Secretary of the Interior designated the pygmy owl as an endangered species and two years later exercised authority under the Endangered Species Act to designate critical habitats for the pygmy owl in Arizona. 16 U.S.C. § 1533(a) (2000); Determination of Endangered Status for the Cactus Ferruginous Pygmy–Owl in Arizona, 62 Fed.Reg. 10,730 (Mar. 10, 1997) (to be codified at 50 C.F.R. pt. 17); Designation of Critical Habitat for the Cactus Ferruginous Pygmy–Owl, 64 Fed.Reg. 37,419, 37,423–25 (July 12, 1999) (to be codified as 50 C.F.R. pt. 17) ("1999 Final Rule"). As a result, large tracts of land in southwest Arizona—over731,000 acres—were set aside as critical habitat for the owl, alerting "the public as well as land-managing agencies to the importance of these areas." 64 Fed.Reg. at 37,419, 37,422. In the Final Rule, the Secretary explained that he "used data on known pygmy-owl locations"—the site-specific information that NAHB now seeks—initially to identify "important areas" for the owl. *Id.* at 37,423. The Secretary then used biological information to connect these "important areas" to determine the owl's likely habitats. *Id.*

In 1998, NAHB filed a FOIA request seeking "previously documented, site-specific locations, with appropriate addresses, identified landmarks, parcel or subdivision maps, polygons, or other points of reference sufficient to allow an average person to locate the property where members of the species are known or believed to exist." The Secretary, acting through the Fish and Wildlife Service ("FWS"), responded to the request by producing hundreds of documents related to the location of pygmy owls. The Secretary redacted these documents, however, to conceal most of the site-specific locations that NAHB sought. Specifically, the Secretary redacted all section information, site directions, site names, and the names and addresses of owners of private lands on which the pygmy owls and their nests have been located.

Dissatisfied with the Secretary's response, NAHB filed this lawsuit to compel disclosure of the owl-sighting information on the grounds that NAHB was entitled to the data as a matter of law under FOIA. The Secretary defended the withholding of information under four FOIA Exemptions:

Exemption 3, for information "specifically exempted from disclosure" by another statute; Exemption 4, for "trade secrets and commercial or financial information obtained from a person and privileged or confidential"; Exemption 5, for "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency"; and Exemption 6, for "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy...." 5 U.S.C. § 552(b)(3)-(6). The Secretary presented the affidavit of FWS Director Jamie Rappaport Clark, which recounted, in pertinent part, experiences in Texas and Arizona, where bird enthusiasts traveled to the location of pygmy owl sightings and adversely affected both the pygmy owls and the private property owners. In Clark's opinion, such incidents have created in landowners a "well founded" fear that birdwatchers, in the hopes of glimpsing the owl, will unlawfully invade the landowners' private property.

The district court granted summary judgment for the Secretary, ruling that the Secretary properly redacted the information under Exemption 6, but that Exemptions 3, 4, and 5 did not apply. The court, relying on the observations in Texas and the Arizona incident, concluded that "releasing the pygmy owl data would result in an unwarranted invasion of privacy." The court recognized that withholding the information would deny the public information that would enable it to locate the pygmy owl's nesting sites, and that the public would therefore be unable to determine whether the Secretary had properly designated critical habitats for the owl. Still, the district court was satisfied that the Secretary's disclosure in the 1999 Final Rule of the method by which critical habitats are designated was sufficient to render the decisionmaking process clear, "even though the ultimate decisions remain secret."

## II.

The Endangered Species Act instructs the Secretary to "determine whether any species is an endangered species or a threatened species because of" a range of enumerated factors, including "the present or threatened destruction, modification, or curtailment of its habitat or range...." 16 U.S.C. § 1533(a)(1). Once the Secretary identifies a species as endangered, the Act imposes penalties upon "any person" who engages in certain prohibited actions with respect to the species. *Id.* § 1538(a). The Act also provides that the Secretary, "to the maximum extent prudent and determinable," shall "designate any habitat of [an endangered or threatened species] which is then considered to be a critical habitat...." *Id.* § 1533(a)(3). The Act specifies that the Secretary should base the critical habitat designation on "the best scientific data available" and should consider "the economic impact, and any other relevant impact, of specifying any particular area as a critical habitat." § 1533(b)(2). In the 1999 Final Rule, the Secretary explained that, in making critical habitat designations, the information about the location of an endangered species is used to form "an interconnected system of suitable and potential habitat areas...." 64 Fed.Reg. at 37,423. "[W]ithin the delineated critical habitat boundaries," the Secretary noted, "only lands containing, or ... likely to develop, those habitat components that are essential for the primary biological needs of the pygmy-owl are considered critical habitat." *Id.*

The purpose of the Freedom of Information Act, as the Supreme Court instructed in *Department of the Air Force*

*v. Rose,* is " 'to pierce the veil of administrative secrecy and open agency action to the light of public scrutiny....' " 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976) (citation omitted). FOIA reflects " 'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.' " *Id.* at 360–61, 96 S.Ct. at 1599 (quoting S.Rep. No. 813, 89th Cong., 1st Sess., 3 (1965)). Although Congress enumerated nine exemptions from the disclosure requirement, "these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Id.* at 361, 96 S.Ct. at 1599; *see also United States Dep't of State v. Ray,* 502 U.S. 164, 173, 112 S.Ct. 541, 546–47, 116 L.Ed.2d 526 (1991); *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 773, 109 S.Ct. 1468, 1481–82, 103 L.Ed.2d 774 (1989). At all times courts must bear in mind that FOIA mandates a "strong presumption in favor of disclosure," *Ray,* 502 U.S. at 173, 112 S.Ct. at 547, and that the statutory exemptions, which are exclusive, are to be "narrowly construed," *Rose,* 425 U.S. at 361, 96 S.Ct. at 1599. In reviewing *de novo* a grant of summary judgment for the government in a FOIA case, the court therefore remains "mindful that the 'burden is on the agency' to show that requested material falls within a FOIA exemption." *Petroleum Info. Corp. v. United States Dep't of the Interior,* 976 F.2d 1429, 1433 (D.C.Cir.1992) (citations omitted).

## A.

■ Under Exemption 6, a federal agency may withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Thus, the threshold question is whether the requested information is contained in a personnel, medical, or similar file. *United States Dep't of State v. Wash. Post Co.,* 456 U.S. 595, 598, 102 S.Ct. 1957, 1959–60, 72 L.Ed.2d 358 (1982); *N.Y. Times Co. v. NASA,* 920 F.2d 1002, 1004 (D.C.Cir.1990) (en banc). If it is, then the court must determine whether the information is of such a nature that its disclosure would constitute a clearly unwarranted privacy invasion. *Dep't of State v. Wash. Post,* 456 U.S. at 598, 102 S.Ct. at 1959–60; *N.Y. Times Co. v. NASA,* 920 F.2d at 1004. This second inquiry requires the court "to balance 'the individual's right of privacy' against the basic policy of opening 'agency action to the light of public scrutiny'...." *Ray,* 502 U.S. at 175, 112 S.Ct. at 548 (quoting *Rose,* 425 U.S. at 372, 96 S.Ct. at 1604). In undertaking this analysis, the court is guided by the instruction that, "under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act." *Wash. Post Co. v. United States Dep't of Health and Human Servs.,* 690 F.2d 252, 261 (D.C.Cir.1982).

In considering the scope of the "similar files" language in Exemption 6, the Supreme Court has made clear that information that "applies to a particular individual" may qualify for protection. *Dep't of State v. Wash. Post,* 456 U.S. at 602, 102 S.Ct. at 1962. The Court explained in *Washington Post* that Congress intended the phrase "similar files" to have "a broad, rather than a narrow, meaning." *Id.* at 600, 102 S.Ct. at 1961. This court accordingly has observed that Exemption 6 "is designed to protect personal information in public records, even if it is not embarrassing or of an intimate nature...." *Nat'l Ass'n of Retired Fed. Employees v. Horner,* 879 F.2d 873, 875 (D.C.Cir.1989). To date, courts interpreting the phrase have considered primarily government files that were maintained on a specific individual or

group. For example, *Reporters Committee,* 489 U.S. at 749, 109 S.Ct. at 1469, involved a request for FBI "rap sheets"—criminal records that identified particular individuals—and *Ray,* 502 U.S. at 166, 112 S.Ct. at 543, involved a request for "information about Haitian nationals who had attempted to emigrate illegally to the United States and were involuntarily returned to Haiti." Also, in *New York Times Co. v. NASA,* this court broadly interpreted the phrase to encompass a recording of a person's "voice inflection at a particular moment," which the court viewed as highly "personal information" pertaining to specific individuals. 920 F.2d at 1005.

The files that NAHB seeks are not files that would normally be described as "detailed Government records on an individual." *Dep't of State v. Wash. Post,* 456 U.S. at 602, 102 S.Ct. at 1961. The Secretary does not suggest that the files contain information on a person's date or place of birth, marriage or employment history, or other intimate details or "damaging information." *Id.* at 601, 102 S.Ct. at 1961. Rather, NAHB seeks only the government's files showing where pygmy owls and their nests had been sighted in Arizona. Exemption 6's "similar files" do not include this geographic information, NAHB contends, because such an expansive reading would mean that any government document referring to an individual in some manner as to identify that individual would fall within the exemption. At oral argument NAHB clarified that it does not seek release of any individual property owners' names; instead, it requests only the site information, such as the square and lot number where the owls were sighted. However, to the extent that square and lot information can lead to identification of individual property owners through a search of state records, the information is at least arguably personal information

that falls within the category of "similar files," for the inquiry turns on "whether the information in the file 'applies to a particular individual,'" not "'the nature of the file[] in which the information [is] contained'...." *N.Y. Times Co. v. NASA,* 920 F.2d at 1007 (quoting *Dep't of State v. Wash. Post,* 456 U.S. at 599, 602, 102 S.Ct. at 1960, 1961–62).

The court need not resolve whether the pygmy owl records constitute "similar files" under Exemption 6. The Supreme Court has embraced the legislative history stating that "'the balancing of private against public interests, not the nature of the files in which the information was contained, should limit the scope of the exemption.'" *Dep't of State v. Wash. Post,* 456 U.S. at 599, 102 S.Ct. at 1960 (quoting S.Rep. No. 813, 89th Cong., 1st Sess., 9 (1965)). Accordingly, we turn to those interests, assuming without deciding that the requested pygmy owl records are "similar files" under Exemption 6.

 To establish that the release of information contained in government files would result in a clearly unwarranted invasion of privacy, the court first asks whether disclosure "would compromise a substantial, as opposed to a *de minimis,* privacy interest." *Horner,* 879 F.2d at 874. If a significant privacy interest is at stake, the court then must weigh that interest "against the public interest in the release of the records in order to determine whether, on balance, disclosure would work a clearly unwarranted invasion of personal privacy." *Id.* (citations omitted). The public interest to be weighed against the privacy interest in this balancing test is "the extent to which disclosure would serve the 'core purposes of the FOIA'" by "'contribut[ing] significantly to public understanding of the operations or activities of the government.'" *United*

*States Dep't of Def. v. FLRA*, 510 U.S. 487, 495, 114 S.Ct. 1006, 1012, 127 L.Ed.2d 325 (1994) (quoting *Reporters Comm.*, 489 U.S. at 775, 109 S.Ct. at 1482–83). Thus, unless a FOIA request advances "the citizens' right to be informed about 'what their government is up to,'" *Reporters Comm.*, 489 U.S. at 773, 109 S.Ct. at 1481, no relevant public interest is at issue.

■ The Secretary relies on the declaration of FWS Director Clark to show that disclosure of private landowners' names and addresses would constitute an unwarranted invasion of those individuals' privacy because birdwatchers and other persons intensely interested in the location of pygmy owls will unlawfully trespass upon the private lands. Clark described an incident in Arizona in which the Audubon Society placed the location of a pygmy owl sighting on its website and telephone hotline: "On the same day the information was placed on the Audubon hotlines several car loads of birders were observed in the area of the reported location. The following day birding groups included at least two out-of-state vehicles." Clark noted that "property owners indicated displeasure at the number of people on and around their properties" during the Arizona incident. She added that, in light of these prior experiences, "several landowners have already discussed their fears of disclosure of the information. . . ." Clark also referred ambiguously to adverse effects from birders on pygmy owls in Texas, but at oral argument the Secretary disavowed any reliance on incidents in Texas as evidence of trespass by birdwatchers.

NAHB contends that the district court erred in relying on what it characterizes as Director Clark's speculative and internally inconsistent declaration. Essentially, NAHB maintains that the single Arizona incident cited by Clark is insufficient to support the speculation that birdwatchers would not only seek out this information in order to locate the owls but would then go to the location and unlawfully trespass on private property. Although it is true that Clark noted that landowners "indicated displeasure at the number of people on and around their properties," it is also true that Clark did not affirmatively state that illegal trespass was a problem during the Arizona incident. And in the 1974 study on which Clark based her conclusion regarding adverse effects on the Texas pygmy owl population, the author stated that the birds were located on "privately owned land," and thus "harassment may not be a problem." Further, the Clark affidavit included as an exhibit an advertisement by a private ranch proclaiming the presence of pygmy owls on its property, but the Secretary offered no evidence that this establishment has been overrun by lawless birdwatchers, as feared by the Secretary and the district court.

The Secretary's evidentiary support for unlawful trespass, therefore, is weak. One incident in which there is no claim that unlawful trespass occurred hardly demonstrates a general problem, and there is nothing to suggest that property owners cannot be protected against unlawful trespassers. Even if property owners have expressed displeasure about birdwatchers' presence on and around their properties, those statements bear little weight in light of the landowners' awareness that the owl information could be disclosed. Before allowing the Arizona Game and Fish Department ("State agency") to survey on their land for pygmy owls, the property owners sign confidentiality agreements providing that although the information will be held confidential, it is subject to public disclosure laws and court orders. As the Secretary rightly notes, this court has stated that where "a substantial probability that disclosure will cause an interference with

personal privacy" exists, "it matters not that there may be two or three links in the causal chain." *Horner,* 879 F.2d at 878. Here, however, the problem is one of likelihood, not causation, for the Secretary has failed to show that unlawful trespass is likely to occur. Although we do not question either the expertise of the FWS Director, who is familiar with the "tenacity" of birdwatchers, or other indications that birdwatching and other forms of ecotourism are growing substantially in popularity, *see* Barton H. Thompson, Jr., *People or Prairie Chickens: The Uncertain Search for Optimal Biodiversity,* 51 Stan. L.Rev. 1127, 1146 (1999), our conclusion recognizes the paucity of evidence from which a reasonable factfinder could find that disclosure of site information will result in unlawful trespass on private property. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

NAHB contends, somewhat less persuasively, that "minimal privacy interest" exists in the "unfocused information" that would be disclosed in this case. It suggests that the data is of dubious reliability for the purposes for which the Secretary speculates it will be used, because it is too voluminous and too old, and because it includes both active and inactive sightings. The Secretary's privacy claim holds some merit, however, because the address of a private landowner on whose property an endangered species has been spotted is not necessarily "unfocused information." Knowing the square and lot numbers of a parcel of land is only a step from being able to identify from state records the name of the individual property owner. In the context of an individual residence, the court has recognized that "the privacy interest of an individual in avoiding the unlimited disclosure of his or her name and address is significant.... In our society, individuals generally have a large measure of control over the disclosure of their own identities and whereabouts." *Horner,* 879 F.2d at 875 (citations omitted). Likewise, the Supreme Court has evinced a reluctance in the FOIA context "to disparage the privacy of the home, which is accorded special consideration in our Constitution, laws, and traditions." *Dep't of Def. v. FLRA,* 510 U.S. at 501, 114 S.Ct. at 1015 (citations omitted). As in *Horner,* "disclosure of the information requested here *could* interfere with the subjects' reasonable expectations of undisturbed enjoyment in the solitude and seclusion of their own homes." 879 F.2d at 876 (emphasis added). But *Horner* is not entirely analogous. There the court was confronted with the concern that former federal government employees would be subject to " 'an unwanted barrage of mailings and personal solicitations' " from entities targeting retired or disabled persons. *Id.* at 876 (citation omitted). Here, the private property owners are similarly concerned that disclosure will result in unwanted contact from strangers. Insofar as the pygmy owl is concerned, however, the property owners already have divulged information about the sightings to the State agency with the understanding that the information, although confidential, might be subject to release under disclosure laws.

Viewing the asserted privacy interests as involving more than minimal invasions of individual privacy, the court must still address the question whether the public interest in disclosure outweighs the individual privacy concerns. As noted, our inquiry is limited to the question whether disclosure will shed light on the "agency's performance of its statutory duties." *Bibles v. Or. Natural Desert Ass'n,* 519 U.S. 355, 356, 117 S.Ct. 795, 795, 136 L.Ed.2d 825 (1997) (per curiam) (citations omitted). We are unpersuaded that knowledge of the Secretary's method is either the same as

disclosing site information or sufficient to reveal what the Secretary "is up to" in designating habitats in particular areas. If the information about owl sightings is erroneous or otherwise deficient, or if the habitat designation is unrelated to the sightings, the method described in the 1999 Final Rule cannot alone save the Secretary from reaching a flawed result.

■ NAHB asserts several "public" interests in disclosure. The first fails because the " 'purposes for which the request for information is made' " have "no bearing on whether information must be disclosed under FOIA." *Bibles,* 519 U.S. at 356, 117 S.Ct. at 796 (quoting *Dep't of Def. v. FLRA,* 510 U.S. at 496, 114 S.Ct. at 1013). Thus, NAHB contends that the pygmy owl data is "vital to NAHB's effective participation" in the Interior Department's reconsideration of the critical habitat designations. Viewed narrowly, as merely enhancing NAHB's lobbying efforts, this purpose does not relate to "the *only* relevant public interest in the FOIA balancing analysis"—the extent to which disclosure would shed light on the "agency's performance of its statutory duties." *Id.* at 355–56, 117 S.Ct. at 795 (citations omitted). To the extent NAHB maintains that property owners need to know whether pygmy owls have been spotted on their property in order to assess their potential liabilities under the Endangered Species Act, the Secretary points out that "landowners are informed when pygmy owls are located on their property." Appellees' Br. at 25.

But NAHB also points to the public interest in examining the FWS's use of the owl data in the 1999 critical habitat designation and "on a day-to-day basis . . . in a broad array of other contexts." Appellant's Br. at 23. This interest in exploring how the Secretary and the FWS are using the information is distinct from NAHB's

more limited interest in itself using the information to advance its lobbying efforts. The former relates to "citizens' right to be informed about 'what their government is up to,' " *Reporters Comm.,* 489 U.S. at 773, 109 S.Ct. at 1481; the latter does not. The Secretary's method set forth in the 1999 Final Rule for designating habitats affords, as the district court recognized, only a partial understanding of why particular areas are designated as habitats. Because disclosure of site-specific information about the pygmy owls could contribute "to public understanding of the operations or activities of the government," *Dep't of Def. v. FLRA,* 510 U.S. at 495, 114 S.Ct. at 1012, it constitutes a cognizable public interest under FOIA.

Upon balancing the privacy interest against the public interest, we conclude that the privacy interest is relatively weak. As the court's reasoning in *Horner* indicates, disclosure of site specific information is not "inherently and always a significant threat" to privacy. 879 F.2d at 877. Rather, the privacy threat depends on the individual characteristics that the disclosure reveals and the consequences that are likely to ensue. Here, to disclose that a pygmy owl has been sighted on an individual's property does not disclose any information about that individual, other than that the individual owns property where an owl has been sighted. Although NAHB has clarified on appeal that it no longer seeks the names of individual property owners, such information can be obtained from state records, and, accordingly, the clarification does not affect our analysis. In *Horner,* by contrast, the requested disclosure would have revealed not only names and addresses but also the additional fact that the individuals on the list were retired or disabled and received assistance from the federal government. *Id.* at 874. Moreover, *Horner* was concerned about

the privacy of the home, whereas the Secretary here sweeps more broadly to protect names and addresses of commercial and residential property.

The other reasons put forth by the Secretary do not lend weight to the asserted privacy interest. The Secretary has established only the speculative potential of a privacy invasion without any degree of likelihood. The access agreement between private landowners and the State agency neither significantly supports the privacy interest asserted nor bars disclosure, as the agreement expressly provides that the information is subject to public disclosure. Given the strong public interest in knowing "what the government is up to," we hold that the Secretary has failed to rebut the presumption favoring disclosure, which is at its zenith under Exemption 6, *Wash. Post v. HHS*, 690 F.2d at 261, by demonstrating that disclosure would be "clearly unwarranted" so as to "tilt the balance" against disclosure. *Id.* (citations omitted).

### B.

The Secretary additionally relies on Exemptions 3, 4, and 5 to justify withholding the information NAHB requests. We agree with the district court that these exemptions do not preclude disclosure.

 Exemption 3 covers data "specifically exempted from disclosure by statute ... provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Consistent with congressional intent that exemptions to disclosure be narrowly construed, the court has identified nondisclosure statutes as those that are "the product of congressional appreciation of the dangers inherent in airing particular data" and that "incor-

porate[ ] a formula whereby the administrator may determine precisely whether the disclosure in any instance would pose the hazard that Congress foresaw." *Am. Jewish Cong. v. Kreps*, 574 F.2d 624, 628–29 (D.C.Cir.1978). Thus, "only explicit nondisclosure statutes that evidence a congressional determination that certain materials ought to be kept in confidence will be sufficient to qualify under the exemption." *Irons and Sears v. Dann*, 606 F.2d 1215, 1220 (D.C.Cir.1979).

The Secretary's reliance on the Endangered Species Act as a statute that establishes particular criteria for withholding particular types of matters is misplaced. Looking first to "the plain language of the statute," *Ass'n of Retired R.R. Workers, Inc. v. United States R.R. Ret. Bd.*, 830 F.2d 331, 334 (D.C.Cir.1987), there is nothing in the Endangered Species Act that refers to withholding information. The Secretary points to § 1533(a)(3), which requires the Secretary, to "the maximum extent prudent and determinable," to "designate" by regulation "any habitat of such species which is then considered to be critical habitat." The Secretary also points to § 1533(b)(2), which provides that "[t]he Secretary may exclude any area from critical habitat if [s]he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat...." But nothing in this language refers to nondisclosure of information.

 Contending that § 1533 supplies criteria for determining whether it would be "prudent" to include or withhold particular location information in the critical habitat designation, the Secretary also points to legislative history that, in her view, suggests that Congress contemplated permitting the Secretary to withhold information in the critical habitat designation.

The cited committee reports indicate that the Secretary should act in "the best interest of the species" and note approvingly the interpretation of "prudent" to refer to situations "where the designation of critical habitat would inform those who would take a species illegally...." H.R.Rep. No. 95–1625, at 16 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453, 9466; H.R.Rep. No. 97–567, at 20 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2820. However, for purposes of qualifying as a withholding statute under Exemption 3, a statute "must *on its face* exempt matters from disclosure. We must find a congressional purpose for exempt matters from disclosure in the actual words of the statute (or at least in the legislative history of FOIA)—not in the legislative history of the claimed withholding statute, nor in an agency's interpretation of the statute." *Reporters Comm. for Freedom of the Press v. United States Dep't of Justice*, 816 F.2d 730, 735 (D.C.Cir.1987) (citation omitted) (emphasis added), *modified*, 831 F.2d 1124 (D.C.Cir.1987), *rev'd on other grounds*, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). As the court stated in *Reporters Committee*, "legislative history will not avail if the language of the statute itself does not explicitly deal with public disclosure," 816 F.2d at 736, and the language of the Endangered Species does not. *Cf. Am. Jewish Cong.*, 574 F.2d at 631.

 Exemption 4 protects "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). The terms in Exemption 4 are to be given their "ordinary meanings," *Pub. Citizen Health Research Group v. Food and Drug Admin.*, 704 F.2d 1280, 1290 (D.C.Cir.1983) (citations omitted), and information is "commercial" under this exemption if, "in and of itself," it serves a "commercial function" or is of a "commer-cial nature." *Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978) (citing *Getman v. NLRB*, 450 F.2d 670, 673 (D.C.Cir.1971)).

The Secretary contends that Exemption 4 applies because the withheld information is confidential commercial information. The Secretary points to a cooperative agreement between the FWS and the State agency, which initially collects the site-specific information after obtaining permission from the landowner and promising to hold the information in confidence (subject to certain exceptions). The agreement generally describes the programs and relationships between the parties and also provides that FWS will supply, upon application, "available financial assistance for the implementation of acceptable projects," and that the parties will "exchange biological and other data...." Because the State agency provides access to its database in return for money, the Secretary maintains that this relationship falls within the ordinary meaning of a commercial transaction.

We are unpersuaded that owl-sighting information qualifies as "commercial or financial" information simply because it was provided pursuant to a government-to-government cooperative agreement. The FWS stated in an internal memorandum (from the Regional Director in Albuquerque, New Mexico) that the State agency is forbidden by statute to sell the owl-sighting data, and it noted that the State agency would be reluctant to do so even if permitted. Instead, the FWS memorandum stated, the State agency provides federal agencies with access to the data only as a condition to the receipt under Section 6 of the Endangered Species Act, 16 U.S.C. § 1535 (2000), of funds that it uses to assist in maintaining its data-collection system. Such a quid-pro-quo exchange between governmental entities does not

constitute a commercial transaction in the ordinary sense. No "business information" is involved, *see Wash. Post v. HHS,* 690 F.2d at 266, and the owl-sighting data itself is commercial neither by its nature (having been created by the government rather than in connection with a commercial enterprise) nor in its function (as there is no evidence that the parties who supplied the owl-sighting information have a commercial interest at stake in its disclosure), *see Am. Airlines,* 588 F.2d at 870; *Bd. of Trade v. Commodity Futures Trading Comm'n,* 627 F.2d 392, 404 (D.C.Cir. 1980), *abrogated on other grounds, United States Dep't of State v. Wash. Post Co.,* 456 U.S. 595, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982); *Getman,* 450 F.2d at 673.

Exemption 5 covers "interagency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Otherwise known as the "deliberative process privilege," Exemption 5 "shelters documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Petroleum Info.,* 976 F.2d at 1433. Information is exempt only if it is both "predecisional" and "deliberative." *Id.* at 1434. "A document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made. Material is deliberative if it 'reflects the give-and-take of the consultative process.'" *Id.* (citations omitted).

The site-specific information that NAHB seeks is predecisional, because the State agency prepared it in part to assist the FWS in making its determinations under the Endangered Species Act. It is not, however, "deliberative." This court

has drawn a distinction between factual information, which "generally must be disclosed," and "materials embodying officials' opinions," which are "ordinarily exempt." *Id.* Although the "fact/opinion distinction ... is not always dispositive," *id.,* it is here. The privilege is designed to protect agency policy-oriented judgments and the processes by which policies are formulated, rather than "purely factual, investigative matters." *Id.* at 1435 (citing *EPA v. Mink,* 410 U.S. 73, 89, 93 S.Ct. 827, 836–37, 35 L.Ed.2d 119 (1973)). Nothing in the requested site-specific information "reflect[s] an agency's preliminary positions or ruminations" about a particular policy judgment. *Id.* Because the material cannot "reasonably be said to reveal an agency's or official's mode of formulating or exercising policy-implicating judgment, the deliberative process privilege is inapplicable." *Id.*

For these reasons, we hold that Exemptions 3, 4, 5, and 6 do not permit withholding the requested site-specific information. Accordingly, we reverse the grant of summary judgment insofar as the district court ruled that Exemption 6 applied, and we remand the case with instructions to order the Secretary to release the site-specific information while withholding the individual property owners' names, which NAHB no longer seeks.