ROGERS, Circuit Judge,
concurring in part and dissenting in part:
In holding that Exemption 6 of the Freedom of Information Act (“FOIA”), 5 U.S.C. § 552(b)(6), is dispositive, Op. at 1056, the court has assessed a strong privacy interest for private physicians who receive Medicare reimbursements while ignoring the commanding public interest in disclosure of information that would enhance the public’s ability to evaluate how well the Department of Health and Human Services (“HHS”) is performing its statutory duties under the Medicare program. As subjective evaluations should not affect the balancing of these interests, it is significant that two district courts here, now and in 1979, and HHS itself have reached a different conclusion about the importance of disclosing such data to the public.
The district court concluded that the data requested by the Consumers’ Checkbook, Center for the Study of Services (“the Center”) would enhance the public’s ability to understand whether HHS is effectively policing reimbursements and physician practices. Consumers’ Checkbook, Ctr. for the Study of Servs. v. Dep’t of Health & Human Servs., 502 F.Supp.2d 79, 85-86 (D.D.C.2007)(“Consumers’ Checkbook I ”). Another district court judge in this district reached much the same conclusion in 1979. Pub. Citizen Health Research Group v. Dep’t of Health, Educ. & Welfare, 477 F.Supp. 595, 604 (D.D.C.1979)(“Public Citizen”), rev’d on other grounds, 668 F.2d 537 (D.C.Cir. *1057 1981). HHS, in turn, has previously released such data to at least one private enterprise unrelated to the agency’s own initiatives, see Alley v. Dep’t of Health & Human Servs., No. CV-07-BE-0096-E, slip op. at 3 (N.D.Ala. May 8, 2008) (“Alley, N.D.Ala.2008”), and also announced as recently as 2007 that it would release much of the requested data to research entities outside of the federal government as part of a program of transparency, Privacy Act of 1974; Report of New System of Records, 72 Fed.Reg. 52,133 (Sep. 12, 2007) (“2007 Records System”). HHS also has not appealed the waiver of FOIA fees for the Center premised on the determination that the requested data is “in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government,” 5 U.S.C. § 552(a)(4)(A)(iii). Perhaps this is because, as Judge Gerhard Gesell wrote in 1979, “[pjraetitioners who contract with the government to provide medical services in exchange for federal payments perform a quasi-public function,” and given “Congress’ abiding concern to deliver cost-efficient public health care and physicians’ clear prerogative to avoid government business,” important public interests are at stake. Public Citizen, 477 F.Supp. at 604.
I.
The Freedom of Information Act requires agencies to disclose all requested agency records, 5 U.S.C. § 552(a), unless a statutory exemption applies, id. '§ 552(b). It is designed to “ ‘pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.’ ” Dep’t of Air Force v. Rose, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) (quoting Rose v. Dep’t of Air Force, 495 F.2d 261, 263 (2d Cir.1974)). Consistent with “the basic policy that disclosure, not secrecy, is the dominant objective of the Act,” the statutory exemptions are “narrowly construed.” Id. at 361. Under Exemption 6 an agency may withhold “personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.” 5 U.S.C. § 552(b)(6) (emphasis added). If a court determines that a substantial privacy interest is at stake, the court must then consider whether the “public interest in disclosure outweighs the individual privacy concerns.” Nat’l Ass’n of Home Builders v. Norton, 309 F.3d 26, 35 (D.C.Cir.2002). FOIA’s “strong presumption in favor of disclosure places the burden on the agency” to justify nondisclosure. Dep’t of State v. Ray, 502 U.S. 164, 173, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991). This “presumption favoring disclosure ... is at its zenith under Exemption 6.” Nat’l Ass’n of Home Builders, 309 F.3d at 37.
In March 2006, the Center requested HHS to release certain Medicare claims data for health care providers in the District of Columbia and the States of Illinois, Maryland, Washington, and Virginia. This data includes the providers’ Medicare identification number, procedure codes, diagnosis codes, and geographic codes, but not patient identities. Although this data does not directly reveal annual Medicare reimbursement amounts for particular Medicare providers, the district court found that the information can be used, in conjunction with free, public information that Congress requires HHS to disseminate to the public, see Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101-508, § 4164, as amended, (“OBRA 1990”), 42 U.S.C. § 1395u note, and a free website for which HHS contracts, to determine those amounts. See Consumers’ Checkbook I, 502 F.Supp.2d at 84-85; Appellant’s Br. at 18.
The crux of the court’s determination today that physicians’ privacy interests *1058 outweigh the public interest in disclosure is its conclusion that the requested data cannot assist the public in assessing either the quality of Medicare services or HHS’s efforts to combat fraud and waste. Op. at 1055-56. In reaching this conclusion the court overstates the inviolability of the privacy interest and overlooks the near undeniable fact that the requested data can be of some assistance to the public’s evaluation of how HHS is carrying out its initiatives aimed at measuring and improving health care quality and its efforts to combat Medicare fraud and waste.
A.
There is little doubt that the disclosure of the requested material would implicate more than a de minimus privacy interest. Privacy encompasses “the individual’s control of information concerning his or her person,” Dep’t of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 763, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989) (“Reporters Comm.”), and extends to protect an individual’s name and address, see Nat’l Ass’n of Retired Fed. Employees v. Horner, 879 F.2d 873, 876 (D.C.Cir.1989); Fed. Labor Relations Auth. v. Dep’t of the Treasury, 884 F.2d 1446, 1453 (D.C.Cir.1989), as well as information that would “in some cases allow for an inference to be drawn about the financial situation of an individual,” even where the data reveals only a portion of an individual’s financial situation, Multi AG Media LLC v. Dep’t of Agric., 515 F.3d 1224, 1230 (D.C.Cir.2008); see also Lepelletier v. FDIC, 164 F.3d 37, 47 (D.C.Cir.1999); Nat’l Parks & Conservation Ass’n v. Kleppe, 547 F.2d 673, 685-86 (D.C.Cir.1976). Indeed, “[w]hen there is a substantial probability that disclosure will cause an interference with personal privacy, it matters not that there may be two or three links in the chain.” Nat’l Ass’n of Retired Fed. Employees, 879 F.2d at 878. HHS suggests that Medicare reimbursements represent, on average, a quarter of a physician’s income, and can account for a “large percentage” of total income for some physicians. Reply Br. at 16.
Nevertheless, as the Center points out, the physicians’ privacy interest is “particularly limited,” Appellee’s Br. at 14-15, because the requested data pertains to receipt of government funds and would not reveal physicians’ take-home earnings. Although the fact of federal government funding may not be dispositive in assessing the privacy interest, see Multi AG Media, 515 F.3d at 1230; Nat’l Ass’n of Retired Fed. Employees, 879 F.2d at 876; Painting and Drywall Work Pres. Fund v. Dep’t of Housing & Urban Dev., 936 F.2d 1300, 1302-03 (D.C.Cir.1991), it cannot be denied that there is an element of public service involved when physicians participate in the Medicare program. See Public Citizen, 477 F.Supp. at 604. Further, because the requested data does not directly reveal total income and because HHS has not shown that one can predictably determine total income using the Medicare reimbursement amounts, “the privacy interest that may exist is [not] particularly strong,” Multi AG Media, 515 F.3d at 1230; see also Getman v. NLRB, 450 F.2d 670, 675 (D.C.Cir.1971); Public Citizen, 477 F.Supp. at 603-04. The extent of that privacy interest varies according to how much of the physician’s income is derived from Medicare; a doctor whose patients are mostly Medicare beneficiaries has a greater privacy interest in her Medicare reimbursement amounts than a doctor who treats only a few Medicare patients. Additionally, Congress has already required HHS to publish some private information about Medicare-participating physicians, see, e.g., OBRA 1990, 42 U.S.C. § 1395u note (requiring release of physicians’ identification number, address, and related in *1059 formation), and HHS has released data much as the Center seeks, see, e.g, Alley (N.D. AJa.2008). Thus, regardless whether a practitioner has many or only a few Medicare patients, HHS fails to meet its burden to show that the privacy invasion at issue would be overly intrusive.
B.
By contrast, there is a commanding and important public interest in disclosure of the data the Center seeks. The single relevant public interest in FOIA balancing is the “extent to which disclosure of the information sought would ‘she[d] light on an agency’s performance of its statutory duties’ or otherwise let citizens know ‘what their government is up to.’ ” Dep’t of Def. v. Fed. Labor Relations Auth., 510 U.S. 487, 497, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994) (quoting Reporters Comm., 489 U.S. at 773, 109 S.Ct. 1468) (alteration in Reporters Comm.). The public interest inquiry focuses, not on the absolute value, but on “the incremental value of the specific information being withheld.” Schrecker v. Dep’t of Justice, 349 F.3d 657, 661 (D.C.Cir.2003) (emphasis added).[1] Because Medicare “distributes extensive amounts of public funds,” there is a “special need” for public oversight of HHS’s activities in administering Medicare. Mul-ti AG Media, 515 F.3d at 1232; see generally Government Accountability Office, Medicare Integrity Program: Agency Approach for Allocating Funds Should Be Revised, GAO-06-813 (Sep.2006). As this court observed in Multi AG Media, “Congress has recognized the importance of ensuring the responsible use” of Medicare funds, 515 F.3d at 1232; see, e.g., Inspector General Act of 1978, Pub.L. No. 95-452, § 2, 92 Stat. 101 (1978). Indeed, HHS itself has acknowledged both that it “shares [the Center’s] broad policy goals,” Appellant’s Br. at 39, in public disclosure, and, in response to the Center’s fee waiver request, that it “do[es] not dispute that the requested records pertains to operations or activities of the Federal Government and that the disclosure of the records would reveal meaningful information about government operations or activities,” Letter from Herb B. Kuhn, Acting Deputy Adm’r, Dep’t of Health & Human Servs., to Robert Krughoff, President, Consumer’s Checkbook, Ctr. for the Study of Servs. 2 (Mar. 16, 2007) (“Kuhn letter of Mar. 16, 2007”) (emphasis added).
There should be little dispute that the requested data would shed light on at least two types of HHS activities.[2] First, the *1060 data would enable members of the public to evaluate HHS’s performance of its statutory duties regarding the quality of Medicare-provided services. Even if HHS does not have statutory authorization to supervise or control the practice of medicine, see 42 U.S.C. § 1395, Op. at 1052, HHS has a statutory and regulatory duty to evaluate and work to improve the quality, cost, and efficiency of services delivered by Medicare providers. For instance, 42 U.S.C. § 1395y(g) requires HHS to enter into contracts with “utilization and quality control peer review organizations” in order to promote improved delivery and quality of health services. See 42 U.S.C. § 1320c et seq. (elaborating upon section 1395y(g)). Likewise, Congress has required HHS to “establish a 5-year demonstration program” for projects examining “health delivery factors that encourage the delivery of improved quality in patient care.” Id. § 1395cc-3 (b). Similarly, HHS’s 2007 Records System is designed “to assist in projects that provide transparency in health care on a broad-scale enabling consumers to compare the quality and price of health care so that they can make informed choices among individual physicians, practitioners and providers of services.” 72 Fed.Reg. at 52,133. Likewise, in 2006 President Bush signed Executive Order No. 13,410, requiring HHS to “implement programs measuring the quality of services supplied by health care providers to the beneficiaries or enrollees” of Medicare. See 71 Fed.Reg. 51,089, 51,090 (Aug. 22, 2006).
Studies show that releasing the data the Center seeks would enable members of the public to evaluate HHS’s effectiveness in fulfilling its duties. One study utilized Medicare claims data in determining that the number of procedures performed by a surgeon was inversely related to patient mortality rates for each of eight studied procedures. See John D. Birkmeyer et al., Surgeon Volume and Operative Mortality in the United States, 349 New Eng. J. Med. 2117, 2122-23 (2003). Other studies indicate that information about the number of times a physician has performed a particular procedure would shed at least some light on that physician’s success rate. See, e.g., Jim C. Hu et al., Role of Surgeon Volume In Radical Prostatectomy Outcomes, 21 J. Clxnioal Oncology 401 (2003); Deborah Schrag et al., Hospital and Surgeon Procedure Volume as Predictors of Outcome Following Rectal Cancer Resection, 236 Annals of Surgery 583 (2002). That there may not be unanimity within the medical profession about the closeness of the correlation between experience and quality does not diminish the public interest in disclosure, as the court implies, see Op. at 9 (citing Ethan A. Halm et al., Is Volume Related to Outcome in Health Care? A Systematic Review and Methodo-logic Critique of the Literature, 137 Annals of Internal Med. 511 (2002)). Neither HHS nor intervenor the American Medical Association (“AMA”) suggests there is no correlation between experience and quality. Even assuming the link between quality and the number of procedures a provider has performed is weak, and even though the requested data will only partially reveal physicians’ experience levels, the data has “incremental value” for ascertaining the quality of services performed both at the provider level and program-wide. See Schrecker, 349 F.3d at 661.
*1061 The requested data also could be used to evaluate the disciplinary and board certification histories of Medicare providers and to study whether Medicare providers meet recommended standards of care for patients with different diagnoses. The data has value over and above currently available information because the public could use it to evaluate the extent of particular physicians’ Medicare participation and to determine whether physicians have qualifications to provide the services for which they seek federal reimbursement; currently available information reveals only whether a physician participates in Medicare. Such independent assessments of the quality of Medicare-funded services, analyzed in the aggregate, would serve as a check on HHS’s own quality-measuring projects, helping the public ascertain possible weaknesses in the Medicare program itself and in HHS’s statutorily-required assessments of the program.
Because “the purpose of FOIA is to permit the public to decide for itself whether government action is proper,” Washington Post Co., 690 F.2d at 264, the existence of internal HHS quality-measuring programs does not diminish the public interest in disclosure. The Supreme Court recognized in Reporters Committee that “the FOIA’s central purpose is to ensure that the Government’s activities be opened to the sharp eye of public scrutiny.” 489 U.S. at 773, 109 S.Ct. 1468. In National Association of Home Builders, this court held even though the agency had released its method for designating owl habitats, there was still a public interest in disclosure of the data used in that determination. 309 F.3d at 363. Similarly, in Multi AG Media, this court observed that the data at issue “sa[id] everything about whether a particular farm is eligible to participate in the [federal] benefit programs in the first place and thus ‘shed[ ] light on the agency’s performance of its statutory duties.’ ” 515 F.3d at 1231 (quoting Reporters Comm., 489 U.S. at 773, 109 S.Ct. 1468). The Center has requested several of the same data elements (including provider identification number, diagnosis information, and surgical procedures performed) that HHS has announced it plans to use in the 2007 Records System as part of its oversight and transparency initiatives. See 72 Fed.Reg. at 52,135. Thus, even assuming HHS does not use the requested data in determining eligibility or deciding whether to pay a claim, the public has an interest in disclosure of the requested data elements. And even if the data would not specifically shed light on a particular HHS initiative, see Op. at 1053-54, the public interest in the data is strong with respect to HHS’s fulfillment of the goal underlying many of its statutory and regulatory activities: improving the quality of health care provided under Medicare.
HHS suggests that disclosure of physician-identifying information (specifically, unique physician identification numbers), even if the requested data could shed light on the performance of HHS’s statutory duties, would not contribute any additional public benefit and so any data release should redact physicians’ names. To the contrary, physician-identifying information would enable the public to analyze the information in context. For example, using the data along with the physician’s name, researchers would be able to ascertain whether a physician’s low Medicare procedure volume is explained by the number of younger patients being treated. Also, withholding identifying information would compromise the public interest in connection with HHS’s reaffirmation of its goal of “enabling consumers to compare the quality and price of health care services so that they can make informed choices among individual physicians, prac *1062 titioners and providers of services.” 72 Fed.Reg. at 52,133. As HHS’s stated policy is to facilitate consumer choices about which providers to patronize, it cannot credibly maintain that providing physician-identifying information could not shed light on its own activities. Moreover, because the data the Center seeks cannot be retrieved in any other way, the public interest in disclosure is not significantly diminished by the derivative nature of its proposed use.[3]
Second, the requested data would shed light on HHS’s fraud-detection and fraud-prevention efforts. For instance, the data could identify providers who perform “a suspiciously large number of procedures in a given time period” or “submit[] claims for procedures that are outside [their] own practice areas.” Appellee’s Br. at 29. The data could therefore facilitate public monitoring of HHS detection and prevention of fraud. Additionally, to the extent that consumer choice could be enhanced by knowing which physicians are potentially responsible for wasteful or even fraudulent claims, release of physician-identifying data is consistent with HHS’s goal of improving consumers’ decisions about which medical providers to patronize. See 72 Fed.Reg. at 52,133. The public could utilize the requested information in determining whether HHS is fulfilling this stated goal.
Again, that there may already be, as HHS and the AMA assert, significant government oversight of physicians that the public can oversee does not diminish the public interest in disclosure of the requested data. For instance, the public can currently use a public database to determine whether Medicare is reimbursing any providers who have already been excluded from Medicare for misconduct. However, FOIA’s purpose is “to permit the public to decide for itself whether government action is proper.” Washington Post Co., 690 F.2d at 264. Consequently, the public’s interest in monitoring compliance is not limited to ensuring that once HHS identifies a provider who has engaged in misconduct, HHS does not reimburse that provider for services. Rather, the public also has an interest in monitoring the effectiveness of HHS’s identification of providers responsible for misconduct. The court’s suggestion that the Center failed to present evidence of alleged fraud that the requested data would reveal creates a heightened disclosure requirement that is without precedent. Op. at 1053-54. Its reliance on Ray, 502 U.S. 164, 112 S.Ct. 541, 116 L.Ed.2d 526, is misplaced; the only issue in that ease was whether the redaction of names and identifying information was lawful, see id. at 168, 112 S.Ct. 541, and the Supreme Court rejected the asserted public interest in release of names and other identifying information for studying the veracity of the released *1063 reports because there was no evidence suggesting that the reports lacked integrity, id. at 179,112 S.Ct. 541. The Center is not asserting a public interest in disclosure of the physicians’ identities for purposes of verifying the accuracy of the other requested data elements. Rather, release of the physicians’ identities would enable the public to place the released information in context and better assess HHS’s fulfillment of it statutory and regulatory goals. As noted by the Center, the Government Accountability Office report, Medicare Integrity Program, Agency Approach for Allocating Funds Should Be Revised, GAO 06-813 (Sep.2006), indicated that HHS had estimated $12.1 billion net of improper payments to Medicare providers in 2005, offering support for the proposition that HHS makes some Medicare payments to fraudulent claimants.
In sum, Medicare providers’ privacy interest in data that would reveal part of their annual income is more than de mini-mus but not particularly strong, especially given previous and planned disclosures by HHS. On the other hand, the requested data would shed light on at least two key HHS responsibilities under Medicare: (1) measuring and improving the quality of health care that is provided and (2) combating and detecting fraud and waste. To the extent that the requested data may shed little light on the quality of health care delivered by physicians with only a few Medicare patients, such physicians also have relatively weak privacy interests in Medicare reimbursement amounts, which likely represent a small portion of their annual income. For physicians treating many Medicare patients, the privacy interest is greater but so is the usefulness of the requested data. HHS has reached the same conclusion as the Center about the meaningfulness of the requested data in informing the public about HHS’s Medicare activities, see, e.g., Kuhn letter of Mar. 16, 2007; 2007 Records System, 72 Fed.Reg. at 52,133. HHS, consequently, has not met its burden to show that release of the requested data “would constitute a clearly unwarranted invasion of personal privacy,” 5 U.S.C. § 552(b)(6) (emphasis added).
III.
Although FOIA Exemption 6 would not bar release of the requested data, HHS contends that release is nonetheless barred by an injunction issued by the United States District Court for the Middle District of Florida in 1979.[4] If the injunction would bar release of the data that the Center seeks, then HHS would not “improperly” be withholding it and the *1064 court would lack jurisdiction to order disclosure. GTE Sylvania, Inc. v. Consumers Union of the United States, Inc., 445 U.S. 375, 384, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980); see Dep’t of Justice v. Tax Analysts, 492 U.S. 136, 142, 109 S.Ct. 2841, 106 L.Ed.2d 112 (1989). The district court concluded that the 1979 Florida injunction was “immaterial” to its analysis because the Center was seeking “different records.” Consumers’ Checkbook I, 502 F.Supp.2d at 86 n. 1. Although this is true, the Center appears to understate the effect of releasing at least some of the requested data in urging a narrow construction of the injunction while HHS appears to overstate the scope of the injunction.
The data requested by the Center does not coincide precisely with the data elements that were covered by the list addressed in the Florida injunction. The Center has requested 29 data elements for claims submitted to HHS, including the physician provider’s identification number, the patient’s diagnosis, the procedures performed, and the time and place of service. It did not request the provider’s name, address, or reimbursement amounts, the elements specifically covered by the Florida injunction, see supra note 4. However, the district court found that by combining the requested data with publicly available information the public could calculate the reimbursement amounts for particular procedures by individual physicians. Consumers’ Checkbook I, 502 F.Supp.2d at 84. The Center has not shown that this finding is clearly erroneous.
The 1979 Florida injunction contains broad language and its purpose to apply broadly is evident from the accompanying declaratory judgment and opinion, see Haskell v. Kansas Nat. Gas Co., 224 U.S. 217, 223, 32 S.Ct. 442, 56 L.Ed. 738 (1912). It “permanently enjoin[s]” disclosure of “any list” of Medicare reimbursement amounts for “any years” that would identify members of the recertified class. Florida Med. Ass’n v. Dep’t of Health, Educ. & Welfare, No. 78-178-Civ-J-s, 1-2 (M.D.Fla.1979). The accompanying declaratory judgments states: “Any ... disclosure of annual Medicare reimbursement amounts, for any years, in a manner that would personally and individually identify the providers of services under the Medicare program who are members of the recertified class in this case is declared to be contrary to federal law.” Id. at 2. The accompanying opinion describes the issue presented as “whether the Secretary ... of [HHS’s predecessor] may disclose information concerning the annual amounts of reimbursements paid to Medicare providers in a way that would individually identify at least some of those providers.” Florida Med. Ass’n, 479 F.Supp. at 1294. The opinion concludes that the list at issue was a “similar file” under FOIA Exemption 6, observing that “[c]ourts must look past mere appearances and beneath labels, to the actual character and nature of the information in question.” Id. at 1303. A 1982 modification provided that the injunction did not prohibit disclosure of annual Medicare payment information about individual physicians pursuant to the law enforcement exception under the Privacy Act, 5 U.S.C. § 552a(b)(7). Florida Med. Ass’n v. Dep’t of Health & Human Servs., No. 78-178-Civ-J-S (M.D.Fla. Dec. 2, 1982).
In these circumstances, Sobering Corp. v. Illinois Antibiotics Co., 62 F.3d 903, 906-07 (7th Cir.1995), and ALPO Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958, 972 (D.C.Cir.1990), on which the Center relies, may not counsel a contrary conclusion about the scope of the 1979 Florida injunction. Although injunctions are to be construed narrowly, “the rule of strict construction of injunctions should not be pressed to a dryly logical extreme,” Scher- *1065 ing, 62 F.3d at 906, and an injunction should be tailored to the harm redressed, ALPO Petfoods, 913 F.2d at 972. HHS views the injunction as protecting against invasions of privacy resulting from release of reimbursement amounts for members of the recertified class, presumably relying on this court’s FOIA precedent regarding linkage, e.g., Nat’l Ass’n of Retired Fed. Employees, 879 F.2d at 878. The Center points out, however, that HHS’s 2007 Records System for quality monitoring, designed to advance the public interest in transparency, would entail releasing to outside researchers the information covered by the 1979 Florida injunction. HHS has responded that such data might not include the reimbursement amounts. See Reply Br. at 11. Where this leaves HHS’s view of the scope of the 1979 Florida injunction is unclear. In any event, the question remains whether any doubt about the scope of the injunction requires it to be read narrowly. See In re Baldwin-United Corp., 770 F.2d 328, 339 (2d Cir.1985).
Furthermore, by its specific terms, the 1979 Florida injunction is limited to the recertified class, as HHS acknowledged during oral argument; it does not reach the release of data concerning other physicians. HHS responds that segregating such data would be an arduous, lengthy task, subject to error. Perhaps so, but HHS has yet to explain satisfactorily why this would be in an age of computerized record keeping. Given FOIA’s presumption in favor of disclosure, HHS is obligated to segregate these records, see 5 U.S.C. § 552(b), or at least to “provide a more detailed justification than the conclusory statements it has offered to date,” Mead Data Centr., Inc. v. Dep’t of Air Force, 566 F.2d 242, 260 (D.C.Cir.1977), as to why segregation would be unreasonable.
Accordingly, I would affirm the district court’s ruling that FOIA Exemption 6 does not bar release of the Medicare data that the Center seeks, at least as to records pertaining to physicians who are not members of the recertified class covered by the 1979 Florida injunction and perhaps with regard to others as well, and I would remand the case to the district court for further proceedings on the scope of the injunction, including an opportunity for HHS to explain why an order requiring segregation of the data would be unreasonable.

. Although in Schrecker the court was addressing FOIA Exemption 7(C) when it emphasized the incremental value of withheld information, only the privacy considerations distinguish Exemptions 6 and 7(C), see Nat’l Archives & Records Admin. v. Favish, 541 U.S. 157, 164-66, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004); the public interest inquiry is the same for both, see Fed. Labor Relations Auth., 510 U.S. at 496 n. 6, 114 S.Ct. 1006. Because the “incremental value” of withheld information is an appropriate public-interest measure under Exemption 7(C), which "is more protective of privacy than Exemption 6,” see id., it is no less of an appropriate measure under Exemption 6.

. During oral argument, the Center discussed 42 U.S.C. § 1395y(a)(l)(B), which precludes reimbursement for services that "are not reasonable and necessary for the prevention of illness.” The Center contends persuasively that the requested data, which includes both the diagnosis and the procedure performed, could shed light on whether HHS is paying providers for services in violation of this prohibition. Additionally, the Center mentioned 42 U.S.C. § 1320a-7(b), which provides that the Secretary of HHS has discretion to exclude providers from participating in federal health care programs for various reasons. One such reason is "claims for excessive charges or unnecessary services.” 42 U.S.C. § 1320a-7(b)(6). The Center contends that the requested data will shed light on the Sec *1060 retary's exercise of discretion because an expert looking at diagnosis information and procedure information could probably determine in some cases whether certain procedures, and by implication any charges for those procedures, were excessive or unnecessary. However, I do not rely on § 1320a-7(b)(6) as it was not cited in the Center’s brief, thus denying HHS an opportunity to respond in its reply brief.

. Although HHS suggests that courts have been disinclined to require disclosure in instances of derivative use, neither the Supreme Court nor this court has adopted a per se rule against derivative uses. See Dep’t of State v. Ray, 502 U.S. 164, 179, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991); Painting and Drywall Work Pres. Fund v. Dep't of Housing & Urban Dev., 936 F.2d 1300, 1303 (D.C.Cir.1991). Indeed, in Getman, this court indicated that use of data in further studies may implicate the relevant public interest, and ordered release of the names and addresses of employees for use in a study of labor representation elections. 450 F.2d at 677. In two subsequent derivative use cases, the court concluded that the public interest in disclosure did not outweigh the privacy interests, distinguishing Getman on the ground that the information in Getman was not otherwise publicly available, whereas the information at issue in those cases could be accessed in other less intrusive ways. See Painting and Drywall Work Pres. Fund, 936 F.2d at 1303; Fed. Labor Relations Auth. v. Dep’t of the Treasury, 884 F.2d 1446, 1452 (1989).

. In Florida Medical Association v. Department of Health, Education and Welfare, 479 F.Supp. 1291 (M.D.Fla.1979), the district court enjoined HHS's predecessor:
from disclosing any list of annual Medicare reimbursement amounts, for any years, which would personally and individually identify those providers of services under the Medicare program who are members of the recertified class in this case.
Florida Med. Ass’n v. Dep’t of Health, Educ. & Welfare, No. 78-178-Civ-J-S, 1-2 (M.D.Fla.1979). The recertified class comprised all physicians licensed to practice in Florida and all AMA members who are not Florida physicians but are providers of Medicare services and would be individually identified in a disclosure. Florida Med. Ass’n, 479 F.Supp. at 1295-96. A federal court in Louisiana issued a similar injunction in 1980. See Am. Ass’n of Councils of Med. Staffs of Private Hosps. v. Health Care Fin. Admin., No. 78-1373 (E.D.La. May 5, 1980). In 2008, a district court in Alabama ruled that the 1979 Florida injunction applies only to data that indicates "annual Medicare reimbursement amounts'' in a manner that would personally and individually identify Medicare providers who are members of the recertified class, or is tantamount to providing such information. See Alley, N.D.Ala.2008.