# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 20, 2022   Decided January 31, 2023

No. 21-5276

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,
APPELLANT

v.

UNITED STATES DEPARTMENT OF JUSTICE,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-03626)

*Jessica A. Lutkenhaus* argued the cause for appellant. With her on the briefs were *Nikhel S. Sus* and *Ari Holtzblatt*.

*John Davisson* was on the brief for *amici curiae* the Electronic Privacy Information Center and the Electronic Frontier Foundation in support of appellant.

*Khahilia Y. Shaw* and *Mehreen A. Rasheed* were on the brief for *amicus curiae* American Oversight in support of appellant.

*Amanda L. Mundell*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Sarah*

*E. Harrington*, Deputy Assistant Attorney General, and *Michael S. Raab*, Attorney.

Before: PILLARD and CHILDS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Opinion concurring in the judgment filed by *Senior Circuit Judge* SENTELLE.

PILLARD, Circuit Judge:   In 2019, the Department of Justice announced that it would resume federal executions using a new lethal agent:  the drug pentobarbital.  Shortly thereafter, Citizens for Responsibility and Ethics in Washington submitted a Freedom of Information Act (FOIA) request for the Bureau of Prisons' records related to its procurement of pentobarbital.  The Bureau of Prisons supplied some records but withheld any information that could identify companies in the government's pentobarbital supply chain. The Bureau invoked FOIA Exemption 4, which protects, among other things, trade secrets and confidential commercial information.  The district court sustained those withholdings and entered judgment for the Bureau.

We conclude on *de novo* review that the Bureau of Prisons has not met its burden to justify the challenged nondisclosures. In particular, the Bureau has not provided the detailed and specific explanation required to justify withholding the information as "commercial" and "confidential" under Exemption 4.  We thus reverse and remand the case to the district court for further proceedings.

**BACKGROUND**

On July 25, 2019, the Department of Justice (Department) announced that it would resume federal executions after a nearly two-decade hiatus. The Department adopted an addendum to the existing federal execution protocol to specify a different lethal agent. It then scheduled executions for several federal inmates.

In lieu of the three-drug procedure used in the past, the addendum authorized a new execution procedure using a lethal dose of a single drug—pentobarbital. A bulk manufacturer of the active pharmaceutical ingredient for pentobarbital, as well as a compounding pharmacy, agreed to contract with the Bureau of Prisons (Bureau) to make an injectable solution. Independent laboratories agreed to conduct quality-control testing on the drug.

The Bureau ultimately used pentobarbital to execute 13 people between July 2020 and January 2021. In December 2020, the Department amended its regulations to authorize methods of execution other than lethal injection. *See* 28 C.F.R. § 26.3(a)(4). But then, in July 2021, the Department announced a moratorium on federal executions.

Meanwhile, Citizens for Responsibility and Ethics in Washington (CREW) was seeking records on the federal government's procurement of pentobarbital, pentobarbital sodium, and/or Nembutal, which we here collectively refer to as "pentobarbital." Less than a month after the Justice Department announced its July 2019 addendum to the execution protocol, CREW sent a FOIA request to the Bureau of Prisons, asking for "all records from February 14, 2019 to the present related to the procurement of pentobarbital, pentobarbital sodium, or Nembutal to be used in federal executions, including without limitation any notifications to or

communications with vendors, solicitation information, requests for information, subcontracting leads, and contract awards." Aug. 8, 2019, FOIA Request to Bureau of Prisons (J.A. 284). CREW submitted a similar FOIA request to the Justice Department, which is not at issue here.

The Bureau of Prisons conducted a search and found 56 pages of non-email records that were responsive to CREW's request, as well as 1,095 responsive email records, of which 848 were duplicative. The Bureau initially deemed all responsive records categorically exempt from disclosure under several FOIA exemptions: Exemption 4 (confidential commercial information), Exemption 5 (privileged material), Exemption 6 (material invading personal privacy), and Exemption 7 (material compiled for law enforcement purposes). *See* 5 U.S.C. § 552(b)(4)-(7).

CREW filed an administrative appeal and, when the Bureau did not respond, sued the Bureau in district court. With the suit pending before the district court, the parties narrowed their dispute to a subset of the responsive records. The Bureau withheld documents pursuant to Exemption 7(E), which applies to "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions . . . if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7). The district court granted summary judgment for CREW on the Exemption 7(E) withholdings, which the Bureau has not appealed.

The Bureau also continued to withhold under Exemption 4—which protects confidential commercial information from disclosure—any documents disclosure of which could reveal

the identity of its pentobarbital contractors. The information withheld under Exemption 4 included the names of the Bureau's contractors as well as key terms from its pentobarbital contracts such as drug price, quantity, expiration dates, invoices, container units, lot numbers, purchase order/reference numbers, substance descriptions, drug concentration, and dates of purchase, service, and/or delivery. To justify its withholdings, the Bureau submitted declarations from a Bureau information specialist, Kara Christenson, and one of its attorneys, Rick Winter. It did not provide declarations or affidavits from the contractors themselves.

The district court granted summary judgment for the Bureau on its Exemption 4 withholdings, concluding that the withheld identifying information was both "commercial" and "confidential" as required under Exemption 4. The court determined that the withheld information was "commercial" because disclosing the contractors' identities could subject the contractors to harassment, cost them business, or cause them to exit the market for pentobarbital altogether. The information was also "confidential" because, at the pentobarbital contractors' request, the government agreed to keep the contractors' identities confidential to the greatest extent possible under law, and the companies themselves have typically kept the information private. CREW timely appealed.

After CREW filed its opening brief in this appeal, the Bureau discovered that seven records withheld in full were already available in the public domain with only limited redactions. Those documents had been filed publicly, with partial redactions of confidential commercial information, as part of the administrative record in other litigation over the Bureau's lethal-injection protocol. *See* Dkt. No. 39-1, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145 (D.D.C. Nov. 13, 2019). On discovering the earlier

disclosure, the Bureau gave the relevant pages of that administrative record to CREW.

## DISCUSSION

We review the district court's grant of summary judgment in a FOIA case *de novo*. *Pavement Coatings Tech. Council v. U.S. Geological Surv.*, 995 F.3d 1014, 1020-21 (D.C. Cir. 2021). On appeal, CREW argues that the Bureau has not adequately demonstrated how information that could identify its pentobarbital contractors is confidential commercial information within the meaning of FOIA Exemption 4. CREW also claims that, because the Bureau has already publicly disclosed certain purportedly identifying information, it has waived the application of Exemption 4 with respect to that same information in other documents. We consider those arguments in turn.

## I.    Exemption 4

FOIA is "designed 'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). The Act requires federal agencies to disclose records to the public on request unless a record is protected by one of nine statutory exemptions. *See* 5 U.S.C. § 552(b). "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting *Rose*, 425 U.S. at 361). The FOIA exemptions must be "narrowly construed," *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (quoting *FBI v. Abramson*, 456 U.S. 615, 630 (1982)), even though they "are as much a part of FOIA's purposes and policies as the statute's disclosure requirement," *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366

(2019) (formatting modified) (quoting *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)).

The agency bears the burden to justify nondisclosure under any exemption it asserts, *Ray*, 502 U.S. at 173, and ordinarily may carry that burden by submitting declarations "attesting to the basis for the agency's decision," *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 30 (D.C. Cir. 1998), *as amended on denial of reh'g* (Mar. 3, 1999). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)).

Exemption 4, the sole exemption at issue on appeal, allows federal agencies to withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). When an agency withholds non-trade-secret information under Exemption 4, it must demonstrate that the withheld information is "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential." *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).

The Bureau asserts that Exemption 4 applies here to certain withheld "commercial and financial information, as well as to identifying information." Christenson Decl. ¶ 43 (J.A. 110-11). The Bureau claims entitlement to withhold "any information that could lead to the identity" of its pentobarbital suppliers or of individuals or companies that "performed related critical services on that [p]entobarbital supply,"

asserting that those individuals or companies "have typically kept [such identifying information] private." *Id.* ¶¶ 48, 51 (J.A. 111-12).

CREW's challenge is a narrow one, focused on just a subset of the Bureau's Exemption 4 withholdings. CREW does not appeal the Bureau's withholding of clearly commercial information, such as "price and contract term negotiations" and "pricing and business strategies," *id.* ¶ 49 (J.A. 112), which fall neatly within Exemption 4. Nor does CREW dispute that any of the withheld information was "obtained from a person." 5 U.S.C. § 552(b)(4); *see id.* § 551(2).

CREW instead zeroes in on two deficiencies it sees in the Bureau's claim of exemption. First, it asserts that the names of the Bureau's contractors cannot be "commercial . . . information" as contemplated by Exemption 4. *Id.* § 552(b)(4). Second, it argues that the Bureau has not met its burden to demonstrate that certain key contract terms, such as drug quantities and expiration dates, could in fact reveal the contractors' identities such that they are "confidential" commercial information. *Id.* Importantly, CREW disputes the commercial nature of only the contractors' names (not the contract terms) and disputes the confidentiality of only the requested contract terms (not the names). In other words, CREW does not dispute that certain Exemption 4 requirements are met—in particular, that the names are confidential and that the contract terms are commercial. We begin then with whether the contractors' names are "commercial . . . information," before turning to whether the Bureau has justified withholding certain contract terms as "confidential" on the ground that they are identifying.

### a. Whether the contractors' names are "commercial . . . information"

Under Exemption 4, the Bureau seeks to withhold the names of contractors involved in the government's procurement and testing of pentobarbital. Again, CREW does not challenge that those names are "confidential" or that they were "obtained from a person." CREW asserts only that the agency fails to meet its burden to demonstrate that the contractors' names are "commercial . . . information."

We hold that the Bureau has not met its burden to justify nondisclosure of the contractors' names. To withhold them under Exemption 4, the government must demonstrate that the names are commercial in and of themselves—a showing that the Bureau here has not made. The Bureau instead reads Exemption 4 to apply whenever disclosure of confidential information, regardless of its character, could have commercial or financial repercussions. But that reading disregards the text of Exemption 4, the structure, history, and purpose of FOIA, and longstanding Exemption 4 precedent.

Our consideration of Exemption 4 "starts with its text." *Milner*, 562 U.S. at 569; *see also Argus Leader*, 139 S. Ct. at 2364. Under the plain text of Exemption 4, the term "commercial" modifies the word "information." 5 U.S.C. § 552(b)(4). "Adjectives modify nouns—they pick out a subset of a category that possesses a certain quality." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018). The use of such a modifier in Exemption 4 "clearly marks the provision's boundaries." *Milner*, 562 U.S. at 569. It signals that Exemption 4 does not cover all confidential information, but rather the subset of such information that is itself commercial. *See Weyerhaeuser*, 139 S. Ct. at 368.

We have explained that, under Exemption 4, information must be commercial "in and of itself," meaning it "serves a 'commercial function' or is of a 'commercial nature.'" *Norton*, 309 F.3d at 38 (quoting *Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978)). Because FOIA does not define the word "commercial," we have given that term its ordinary meaning. *Id.* And, in ordinary parlance, information is commercial if it pertains to the exchange of goods or services or the making of a profit. *See* Webster's Third New International Dictionary 456 (1966) (defining "commercial" to mean "of, in, or relating to commerce" or "having profit as the primary aim"); *id.* (defining "commerce" to mean "the exchange or buying and selling of commodities esp. on a large scale and involving transportation from place to place"); Webster's New World Dictionary 294 (1968) (defining "commercial" to mean "of, or connected with commerce" or "made or done primarily for sale or profit").

Given the ordinary meaning of "commercial," Exemption 4 paradigmatically applies to records that a business owner customarily keeps private because they "actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or [that] relate to the income-producing aspects of a business." *Pub. Citizen*, 704 F.2d at 1290. The exemption "applies (among other situations) when the provider of the information has a commercial interest in the information submitted to the agency." *Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006). Indeed, in enacting FOIA, Congress sought to shield from public release intrinsically valuable business information such as "business sales statistics, inventories, customer lists, and manufacturing processes." S. Rep. No. 89-813, at 9 (1965); *see also* H.R. Rep. No. 89-1497, at 10 (1966) (similar).

While the exemption is "not confined" to information "'relate[d] to the income-producing aspects of a business,'" *Baker & Hostetler*, 473 F.3d at 319 (emphasis omitted) (quoting *Pub. Citizen*, 704 F.2d at 1290), its reach is finite. As we have long recognized, "not every bit of information submitted to the government by a commercial entity qualifies for protection under Exemption 4." *Pub. Citizen*, 704 F.2d at 1290.

In particular, Exemption 4 does not cover all information the public disclosure of which could inflict commercial harm. The exemption's text, especially when read in statutory context, confirms as much. Unlike other FOIA exemptions enacted at the same time, Exemption 4 does not make potential consequences of disclosure an explicit ground for withholding. Take Exemption 6, which protects "personnel and medical files and similar files the *disclosure of which* would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (emphasis added). Similarly, Exemption 7 applies to "records or information compiled for law enforcement purposes, but only to the extent that *the production of* such law enforcement records or information" has specific statutorily enumerated consequences. *Id.* § 552(b)(7) (emphasis added). By their own terms, Exemptions 6 and 7 require the government to consider how disclosure might have certain statutorily enumerated repercussions. Exemption 4 contains no such language; it protects only information that is itself a "trade secret[]" or "commercial or financial information obtained from a person and privileged or confidential." *Id.* § 552(b)(4). If the requirement that information be "commercial or financial" were satisfied by commercial or financial consequences alone, Congress could have crafted a different exemption, akin to Exemptions 6 and 7. It could have protected, for instance, "information obtained from a person which is privileged or confidential, the disclosure of which

could affect a commercial or financial interest." But Congress did not do so, and we must give effect to the language Congress chose.

Just as Exemption 4 does not protect against any and all commercial harm, it does not directly protect against asserted harm to the government as a result of public scrutiny following disclosure. The Bureau warns that advocacy by death penalty opponents has made it difficult for governments to acquire pentobarbital for use in executions, implying that further disclosure will only compound that difficulty. *See* Christenson Decl. ¶ 57 (J.A. 114). But that possibility does not itself render Exemption 4 applicable. The Bureau concedes as much. *See* Oral Argument at 30:48-56. After all, the text of Exemption 4 does not in any way refer to the government's interests. In that regard, it contrasts markedly with Exemption 7(A), for instance, which protects certain law enforcement records to the extent their production "could reasonably be expected to interfere with enforcement proceedings." *Compare* 5 U.S.C. § 552(b)(7)(A), *with id.* § 552(b)(4). To the extent that Congress shares the Bureau's concern about its ability to find willing contractors to supply drugs for use in executions, Congress could of course legislate—as several states have done—that the government keep confidential the identities of any entities involved in the lethal injection process. *See, e.g.*, Ark. Code Ann. § 5-4-617(h)(i)(1)(B); Miss. Code Ann. § 99-19-51(3)(c), (4); Tex. Code Crim. Proc. Ann. art. 43.14(b)(2). But, again, Congress has not done so. In the absence of any such legislation, our "judicial role is to enforce" the balance Congress struck in enacting FOIA, rather than "expand (or contract) an exemption" on a case-by-case basis. *Milner*, 562 U.S. at 571 n.5.

Informed by Exemption 4's plain text, statutory context, and history, we take further guidance from our precedent

interpreting and applying the line between commercial and noncommercial information. In evaluating Exemption 4 withholdings, we have consistently looked to whether information is commercial "in and of itself," meaning it "serves a 'commercial function' or is of a 'commercial nature.'" *Norton*, 309 F.3d at 38 (quoting *Am. Airlines*, 588 F.2d at 870). We have read Exemption 4 to cover only information that, in and of itself, demonstrably pertains to the exchange of goods or services or the making of a profit.

We have defined commercial information to include, for example, a firm's data or reports on its commercial service or its product's favorable or unfavorable attributes, *see, e.g.*, *Pub. Citizen*, 704 F.2d at 1290; *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 830 F.2d 278, 279-81 (D.C. Cir. 1987), *vacated on other grounds*, 975 F.2d 871 (1992) (en banc), or information an industry has gathered regarding its competitive strengths and weaknesses, *see, e.g.*, *Baker & Hostetler*, 473 F.3d at 319. In so doing, we have looked to the nature of the information itself. Consider *Public Citizen*, in which we held that health and safety data that medical device manufacturers submitted to the Food and Drug Administration were commercial information. 704 F.2d at 1290. We there reasoned that the manufacturers "clear[ly]" had a "commercial interest" in the information itself, which "document[ed] . . . the health and safety experience of their products" and would thus "be instrumental in gaining marketing approval for their products." *Id.* Likewise, in *Critical Mass* we readily concluded that nuclear plant safety reports prepared by a utility industry consortium were commercial information. 830 F.2d at 279-80. To reach that conclusion, we examined the "character of the information" in the reports; the information we identified as commercial included "details of the operations of [utility companies'] nuclear power plants," "apprais[als]" of the products of certain vendors, and descriptions of "health and

safety problems experienced during the operation of nuclear power facilities." *Id.* at 281.

Conversely, the government may not rely on Exemption 4 where the withheld information only tenuously or indirectly concerns the exchange of goods or services or the making of a profit. *See, e.g.*, *Norton*, 309 F.3d at 38-39; *Wash. Rsch. Project v. Dep't of Health, Educ. & Welfare*, 504 F.2d 238, 244-45 (D.C. Cir. 1974); *Getman v. NLRB*, 450 F.2d 670, 673 (D.C. Cir. 1971). For instance, in *Norton* we held that Exemption 4 did not apply to owl-sighting data created through a partnership between the U.S. Fish and Wildlife Service and a state agency. 309 F.3d at 38-39. We explained that, even though the state agency conditioned the Service's database access on the state agency's receipt of federal funds, the data exchange did "not constitute a commercial transaction in the ordinary sense" because the state was "forbidden by statute to sell the owl-sighting data," the data were not created "in connection with a commercial enterprise," and there was "no evidence that the parties who supplied the owl-sighting information ha[d] a commercial interest at stake in its disclosure." *Id.* Similarly, in *Washington Research Project*, we concluded that Exemption 4 did not apply to a scientist's research designs as submitted in federal grant applications, because it "defie[d] common sense to pretend that the scientist is engaged in trade or commerce." 504 F.2d at 244. And in *Getman*, we held that a "bare list" of the names and addresses of employees eligible to vote in certain union representation elections "cannot be fairly characterized" as commercial, making Exemption 4 "[o]bviously" inapplicable. 450 F.2d at 673.

Cognizant of the statutory terms and precedents that bind us, we turn to the question presented here: whether the withheld names of the Bureau's pentobarbital contractors are

"commercial" information within the meaning of Exemption 4. Perhaps not surprisingly, we have never considered whether Exemption 4 applies to a business's name. After all, most businesses—unlike, apparently, the contractors here—eagerly disclose their names, whether to publicize their identities, develop their brands, register their names as trademarks, or use them as website domains. And, where business names are not customarily and actually kept private, they are not in any case confidential commercial information that may be withheld under Exemption 4. *See Argus Leader*, 139 S. Ct. at 2363-66. That pervasive reality is no obstacle here because, as noted above, CREW challenges only the commercial character of the contractors' names, not their confidentiality.

The Bureau seeks to justify withholding the contractors' names because, if they were disclosed, the contractors could face public opprobrium aimed at discouraging them from providing pentobarbital for use in executions, which in turn might hurt the contractors' business or cause them to voluntarily exit the pentobarbital market. *See* Christenson Decl. ¶¶ 43-60 (J.A. 110-15). According to the Bureau, its suppliers are "well aware" that businesses "are commonly subject to harassment, threats, and negative publicity leading to commercial decline when it is discovered that they are providing substances to be used in implementing the death penalty." *Id.* ¶ 52 (J.A. 112-13). The Bureau describes how one pharmacy demanded that a state prison system return its drugs once the public discovered the state was using them for executions, *id.* ¶ 53 (J.A. 113), how another company exited the market for a lethal substance after a concerted campaign by anti-death penalty advocates, *id.* ¶ 56 (J.A. 114), and how difficult it has become for state and federal government agencies in the United States to find suppliers for lethal injections, *see id.* ¶ 57 (J.A. 114-15).

On its own terms, the Bureau's claim of exemption suffers from some shortcomings. First, the Bureau's own declarations cast at least some doubt on its claim that the contractors' names are commercial information. In one of its declarations, the Bureau stated that it applied Exemption 4 to "commercial and financial information, *as well as to identifying information*" in the requested records. *Id.* ¶ 43 (J.A. 110-11) (emphasis added). It makes little sense to treat "identifying information" as a distinct category from "commercial and financial" information unless identifying information is not necessarily commercial in and of itself.

Second, the Bureau conflates the "commercial" and "confidential" inquiries under Exemption 4. The Bureau's own declarations make clear that the risk of public outrage is why "[t]his [identifying] information is kept private." *Id.* ¶ 52 (J.A. 112). But the fact that a business's name is kept private shows only that it may be "confidential"—and CREW does not dispute that the contractors and the government have so treated the names of the contractors at issue here. *See Argus Leader*, 139 S. Ct. at 2366. It is not enough under Exemption 4, however, for information to be "confidential." We would "torture[] the plain meaning of Exemption (4)" to apply it to "any information given [to] the [g]overnment in confidence." *Getman*, 450 F.2d at 673; *cf. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9, 12 (2001). The information must also be commercial in its own right. *Norton*, 309 F.3d at 38.

Third, the Bureau claims that companies are exiting the market for lethal injection drugs as a result of activist pressure, but its cited examples show that companies have exited or decided against participating in the lethal injection market for various reasons, not all of them commercial. A Danish manufacturer of pentobarbital stopped selling it for use in

executions because "[t]hat manufacturer opposed the death penalty." *Glossip v. Gross*, 576 U.S. 863, 871 (2015); *see also* Christenson Decl. ¶ 56 (J.A. 114). A German manufacturer of propofol, a drug incorporated in Missouri's execution protocol, no longer sells the drug for executions out of concern that the European Union would ban all exports of the drug for any purpose if it were ever used in executions. *See* Kevin Murphy, *German firm blocked shipments to U.S. distributor after drug sent for executions*, REUTERS (Oct. 10, 2013, 10:57 PM), https://perma.cc/963D-P5WU; Christenson Decl. ¶ 113 (J.A. 133) (citing the Murphy article); DOJ Br. 23-24. And one testing laboratory publicly announced that it would not test pentobarbital for use in executions after it learned that it had "unknowingly been testing pentobarbital" for use as a lethal agent, despite the laboratory's longstanding "refus[al] to do so." E. Michael Pruett & Russell Odegard, *Testing Pentobarbital*, DYNALABS (July 10, 2020), https://perma.cc/MD96-ZC6C; *see* Christenson Decl. ¶ 118 (J.A. 135-36). The Bureau thus ignores the degree to which reasons other than commercial effects of public outcry have prompted companies to exit the pentobarbital market.

Even apart from those evidentiary shortcomings, the Bureau's claim of exemption fails for an antecedent, independent reason: The Bureau does not explain in any detail how a contractors' name is commercial "in and of itself"—that is, how the name "serves a 'commercial function' or is of a 'commercial nature.'" *Norton*, 309 F.3d at 38 (quoting *Am. Airlines*, 588 F.2d at 870). Instead, the Bureau rests its claim of exemption *exclusively* on the potential commercial consequences of disclosure, asserting that the contractors could face public hostility and resulting economic harm if their names were disclosed. At oral argument, the Bureau went further to claim that Exemption 4 covers any confidential information the disclosure of which could have commercial

consequences, positive or negative.  Oral Argument at 22:09-19.

But the commercial consequences of disclosure are not on their own sufficient to bring confidential information within the protection of Exemption 4 as "commercial."  As discussed above, such an approach is at odds with the text and context of Exemption 4 and our own precedent. *See supra* at 11-14.  And it would stretch Exemption 4 to cover nearly any information that a business and the government agreed to keep secret, vitiating FOIA's ability to shine light on public contracting.

Indeed, the Bureau's approach subverts the very purposes that Congress enacted FOIA to serve.  The Bureau claims that the contractors' names should be exempt from disclosure because, as a result of significant public interest in those names, disclosure could cause the contractors to face criticism that might, in turn, cause them to suffer financially.  Far from "open[ing] agency action to the light of public scrutiny," *Ray*, 502 U.S. at 173 (quoting *Rose*, 425 U.S. at 361), that theory of exemption converts "public scrutiny" into a potential basis for withholding information.  Under the Bureau's approach, whenever public scrutiny might have reputational repercussions with potential knock-on commercial effects, the government and a contractor could shield information from public view simply by agreeing to keep it secret.  That is not what Congress had in mind when it protected "citizens' right to be informed about 'what their government is up to.'"  *Id.* at 177 (quoting *Dep't of Just. v. Reporters Comm.*, 489 U.S. 749, 773 (1989)).

With little else to justify its Exemption 4 withholdings, the Bureau seeks support in acontextual readings of stray sentences from our past decisions.  The Bureau leans on *Baker & Hostetler* and *Critical Mass*, where we noted as relevant under

Exemption 4 that the "commercial fortunes" of a business "could be materially affected by the disclosure." *Baker & Hostetler*, 473 F.3d at 319 (quoting *Critical Mass*, 830 F.2d at 281). The Bureau also points to *Norton*, where we considered in part whether the parties submitting owl-sighting information had a "commercial interest at stake in its [non]disclosure." 309 F.3d at 39. *But cf. Pub. Citizen*, 704 F.2d at 1290 (evaluating whether medical device manufacturers had a "commercial interest in the requested information" without regard to any potential consequences of disclosure). Those decisions identify commercial harms a business might suffer following disclosure as confirmation of the commercial or noncommercial nature of the information itself. They do not treat such consequences alone as sufficient to establish that information is "commercial" under Exemption 4.

Our cases consistently consider whether the information in and of itself has a commercial nature or serves a commercial function. *See Norton*, 309 F.3d at 38; *supra* at 12-14. *Baker & Hostetler* is illustrative. There, we held that letters submitted to the government on behalf of American lumber companies in connection with a trade dispute were confidential commercial information. *Baker & Hostetler*, 473 F.3d at 318-320. In reaching that conclusion, we first described the commercial content of the letters themselves: The letters detailed the "commercial strengths and weaknesses of the U.S. lumber industry," the effect of potential trade measures "on the commercial activities and competitive position of domestic lumber companies," the "requirements for achieving a competitive . . . lumber market," the "competitive challenges that domestic lumber companies face[d]," and the industry's views and recommendations regarding negotiations in the U.S.-Canada lumber trade dispute. *Id.* at 319. The fact that "disclosure would help rivals to identify and exploit" the American lumber industry's "competitive weaknesses" only

reinforced that those letters contained commercial information. *Id.* at 320. Put otherwise, we highlighted the commercial consequences of disclosure only to confirm what we had already found apparent from the letters themselves: that they contained "commercial . . . information."

In sum, the Bureau does not attempt to show that its contractors' names are "commercial" in and of themselves, but instead reasons by example to suggest the contractors will suffer commercial harm on disclosure. Heeding the Supreme Court's command to give FOIA exemptions a "narrow compass," *Milner*, 562 U.S. at 571 (quoting *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989)), we reaffirm that withheld information must be commercial in and of itself to qualify for withholding under Exemption 4; that disclosure might cause commercial repercussions does not suffice to show that information is "commercial" under Exemption 4. Because the Bureau impermissibly relies solely on the downstream opposition that the pentobarbital contractors might suffer on disclosure of their names, we need not now decide whether or under what other circumstances a business name might itself be "commercial . . . information" for purposes of Exemption 4.

We reverse and remand for further proceedings because the Bureau has not provided "detailed and specific information demonstrating 'that material withheld is logically within the domain of'" Exemption 4. *Campbell*, 164 F.3d at 30 (quoting *King v. U.S. Dep't of Just.*, 830 F.2d 210, 217 (D.C. Cir. 1987)). On remand, the district court may require supplemental affidavits to help it determine whether the contractors' names demonstrably pertain to the exchange of goods or services or the making of a profit, such that they may be withheld under Exemption 4. *See Pavement Coatings*, 995 F.3d at 1024. What matters is whether the contractors' names in and of themselves are commercial or noncommercial, not whether the names

might reveal the existence of a contract likely to attract public scrutiny.

### b. Whether key contract terms are "confidential"

CREW also challenges the Bureau's Exemption 4 withholding of so-called "key contract terms"—namely, drug prices, quantities, expiration dates, invoices, container units, lot numbers, purchase order/reference numbers, substance descriptions, drug concentrations, and dates of purchase, service, and/or delivery. The Bureau asserts that disclosing those terms could reveal the identities of individuals and companies involved in the procurement of pentobarbital. CREW does not dispute that those terms are "commercial" and were "obtained from a person"; it challenges only whether the Bureau has met its burden of showing those terms are "confidential."

To address that claim, we begin with the meaning of the word "confidential," which the Supreme Court recently clarified in *Argus Leader*. *Argus Leader* considered two conditions that might be required for information provided to the government to be confidential within the meaning of Exemption 4: (1) that information is "customarily kept private, or at least closely held, by the person imparting it," and (2) that "the party receiving [the information] provides some assurance that it will remain secret." 139 S. Ct. at 2363. The Court held that at least the first condition must be met, reasoning that "it is hard to see how information could be deemed confidential if its owner shares it freely." *Id*. In *Argus Leader*, the government met that condition with uncontested testimony that the businesses providing the information to the government "customarily do not disclose [it] or make it publicly available 'in any way.'" *Id*. As to the second possible condition, the Court held that it need not consider whether privately held

information might "*lose* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private," because such assurances had been provided. *Id.* We likewise do not decide whether the second condition must be met, because CREW does not dispute the point for purposes of this appeal.

Ordinarily then, to justify Exemption 4 withholding, the government must at least demonstrate that the withheld information itself is "customarily and actually treated as private by its owner." *Id.* at 2366. Here, that would mean showing that the contractors customarily and actually maintain in secrecy their drug prices, expiration dates, and other withheld contract terms.

But in its declarations the Bureau did not attempt to make that showing directly, instead taking a different and unconventional tack. It first asserted that it withheld certain contract terms because they "could lead to the identity of" individuals or companies involved in its pentobarbital supply, and, second, claimed that the information "described above"— that is, the potentially identifying information—"is confidential" because the pentobarbital contractors "have typically kept it private, have specifically designated the information as proprietary and/or confidential," and have asked the government to maintain the same confidentiality "to the greatest extent possible under the law." Christenson Decl. ¶¶ 48, 51 (J.A. 111, 112). In other words, the Bureau did not seek to show the confidentiality of the contract terms as such; it predicated its claim of confidentiality wholly on their potential to identify the contractors.

Again, CREW's claim regarding the contract terms is circumscribed. CREW does not dispute that the contractors

"customarily and actually" keep *identifying* information private, as *Argus Leader* held is required for Exemption 4. 139 S. Ct. at 2366. CREW instead argues that the Bureau's theory places contract terms "logically within the domain" of Exemption 4 only to the extent they could reveal the contractors' identities. *Campbell*, 164 F.3d at 30 (quoting *King*, 830 F.2d at 217). In other words, CREW accepts that any contract terms that are identifying are "confidential" under the Bureau's claim of exemption. Indeed, CREW already conceded before the district court that some contract terms, such as company logos and company brochures, could plainly identify the contractors and are therefore "confidential" under the Bureau's theory. *See* Christenson Decl. ¶ 48 (J.A. 111-12). But as to contract terms that are not identifying—whether in isolation or in combination with other terms—the Bureau has offered no other reason to believe they fall within the exemption. On appeal, CREW thus asserts entitlement only to those contract terms for which the Bureau has not provided "detailed and specific information" showing that they are in fact identifying. *Campbell*, 164 F.3d at 30.

The district court concluded that the Bureau need not explain how any contract term is identifying, because under Exemption 4, "[c]ompanies need not justify why they keep information confidential." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 567 F. Supp. 3d 204, 214 (D.D.C. 2021). The Bureau makes a similar argument on appeal. It is true that, in general, the government needs to show that information is "customarily and actually treated as private by its owner," not necessarily why it is so treated. *Argus Leader*, 139 S. Ct. at 2366. But that sidesteps the crux of CREW's argument. The issue is not *why* any particular information is confidential, but rather, *whether* it is confidential given the Bureau's declarants' only claim: that the contractors keep *identifying* information private.

It is well established under our precedent that "[t]o justify summary judgment, a declaration must provide detailed and specific information demonstrating 'that material withheld is logically within the domain of the exemption claimed.'" *Campbell*, 164 F.3d at 30 (quoting *King*, 830 F.2d at 217). Here, the withheld contract terms are logically within the domain of the Bureau's Exemption 4 claim only to the extent they constitute "information that could lead to the identity of" individuals or companies in the Bureau's pentobarbital supply chain. Christenson Decl. ¶ 48 (J.A. 111). Because the Bureau chose to structure its exemption claim in two steps—that is, asserting first that the contractors keep identifying information private and second that the contract terms are identifying— particular contract terms are appropriately withheld under Exemption 4 only to the extent both steps have been demonstrated to the district court's satisfaction.

Therefore, to meet its burden to justify withholding, the Bureau must persuade the district court to hold that "detailed and specific information" demonstrates that the contract terms could in fact reveal the identities of the Bureau's pentobarbital contractors. *Campbell*, 164 F.3d at 30. It cannot rely on "conclusory," "vague," or "sweeping" assertions as to their identifying power. *Id.* (quoting *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1387 (D.C. Cir. 1979)).

Because the district court did not require the Bureau to explain how the contract terms are identifying, we reverse and remand for further proceedings consistent with this opinion. On remand, the district court should determine whether the Bureau has carried its burden of demonstrating that the withheld contract terms are in fact identifying. Should the district court conclude that any identifying information is appropriately withheld under Exemption 4, it should also make an express finding as to whether portions of the withheld

documents are reasonably segregable. *See Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).

## II. Waiver

Finally, CREW contends that the Bureau waived the application of Exemption 4 with respect to certain contract terms that are already in the public domain. While preparing its response to CREW's opening brief, the Bureau discovered that it had previously released some drug-concentration and expiration-date information as part of the administrative record in other litigation over its execution protocol. *See* Dkt. No. 39-1, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145 (D.D.C. Nov. 13, 2019). The Bureau has provided those already-disclosed records to CREW. But CREW argues that the Bureau has waived its Exemption 4 withholdings as to the same information in other documents.

CREW's claim to additional records containing drug-concentration and expiration-date information rests on our public-domain doctrine. Under that doctrine, "materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999); *see also CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1154 (D.C. Cir. 1987). The doctrine flows from "'the logic of FOIA'" because "where information requested 'is truly public, then enforcement of an exemption cannot fulfill its purposes.'" *Cottone*, 193 F.3d at 554 (quoting *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999)). We have thus applied the public-domain doctrine across a range of FOIA exemptions to require disclosure of information already in the public domain even if it otherwise would have been exempt. *See id.*

As the party advocating disclosure, CREW bears the burden of production and must "point[] to specific information in the public domain that appears to duplicate that being withheld." *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983). "Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007).

On appeal, we cannot determine on the existing record whether the Bureau waived Exemption 4 with respect to certain expiration-date and drug-concentration information. We would need to know, for instance, what specific expiration dates and drug concentrations have been publicly released and whether records containing those very same dates and concentrations are still being withheld because they include that information. *See id.* Those factual inquiries are the "province of the district court," *Powell v. U.S. Bureau of Prisons*, 927 F.2d 1239, 1243 & n.7 (D.C. Cir. 1991), but that court has not yet weighed in because the earlier disclosure was discovered for the first time on appeal.

A remand "best serve[s] the interests of justice and fairness." *Powell*, 927 F.2d at 1243-44; *see* 28 U.S.C. § 2106. The Bureau's earlier release of records containing drug concentrations and expiration dates "go[es] to the heart" of what the Bureau may still withhold under Exemption 4, including whether those contract terms are in fact identifying. *Powell*, 927 F.2d at 1243 (alteration in original) (quoting *In re AOV Indus., Inc.*, 797 F.2d 1004, 1013 (D.C. Cir. 1986)); *see also, e.g.*, *New York Times Co. v. U.S. Dep't of Just.*, 756 F.3d 100, 110 & n.8 (2d Cir.), *amended on denial of reh'g*, 758 F.3d 436 (2d Cir.), *supplemented on denial of reh'g*, 762 F.3d 233 (2d Cir. 2014). Were the court not to consider that earlier release, CREW might be unfairly deprived of records to which

it is entitled.  We thus remand to the district court to determine in the first instance whether and to what extent any information in the public domain is the basis on which the government seeks to withhold any records or reasonably segregable portions thereof under Exemption 4.

* * *

For the foregoing reasons, we reverse the district court's decision granting the Bureau's motion for summary judgment and remand for further proceedings consistent with this opinion.

*So ordered.*

SENTELLE, *Senior Circuit Judge*, concurring in the judgment: I join the disposition ordered by the majority, that is to say, reversing and remanding for further proceedings. As we have noted in the past, "[t]he vast majority of FOIA cases can be resolved on summary judgment." *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 584 (D.C. Cir. 2020) (quoting *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011)). But this does not mean that summary judgment is always appropriate. Rule 56 applies where there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). In this case, it appears that further factual development is necessary, if perhaps not a full-blown trial.

I am not, however, in full concurrence with the majority's opinion regarding the commercial nature of the companies' names. In many instances, the correct answer to a question can vary depending upon how the question is phrased. I understand the majority's reluctance to find that a company's name fits within the exemption for confidential and commercial information. After all, companies advertise under their names. Nonetheless, the relevant question can also be rephrased as "Can the identity of a party to a contract be commercial information?" And the answer to this question may be a different one; the companies' contractual obligation to provide the Bureau of Prisons with lethal injection drugs "pertains to the exchange of goods . . . or the making of a profit." Maj. Op. at 10; *see* CREW Opening Br. at 18 ("[I]nformation is itself commercial if it is connected with the exchange of goods."). It appears that the companies in this case quite reasonably wish to protect their contractual arrangements by maintaining the confidentiality of their identities as suppliers of lethal injection drugs. As the evidence shows, previous supplying entities were subjected to protests, suffered economic disadvantage, and withdrew from the market once identified as such suppliers.

2

Therefore, while I agree with reversing and remanding, I would also hope that full examination of the evidence with respect to this claimed exemption would be undertaken on remand.